IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN ALLEN RAINWATER,

        Plaintiff,                  No. 2:11-cv-0030 GGH P

        vs.

JOHN McGINNISS, Sheriff, et al.,       <u>ORDER</u>

        Defendants.

_____/

I. <u>Introduction</u>

       Plaintiff is a civil detainee proceeding pro se.  He seeks relief pursuant to 42 U.S.C. § 1983.  This case is before the undersigned pursuant to both parties' consent.  Docs. 4, 44.  Presently pending is the sole defendant in this case, Sheriff John McGinnis' motion for summary judgment.  In a related case, No. 2:10-cv-1727 GGH P, plaintiff raised nearly identical claims but from a different time period (June 2009 to October 2009).  On August 9, 2012, the court issued an order granting summary judgment and closing that case.

       Plaintiff was deemed a Sexually Violent Predator (SVP) pursuant to the California's Sexually Violent Predator Act (SVPA).  Plaintiff is usually housed at Coalinga State Hospital but was transferred to Sacramento County Main Jail (SCMJ) for court appearances from January 5, 2010, to February 18, 2010, (45 days), July 22, 2010, to August 5, 2010, (15 days) and September 2, 2010, to November 18, 2010, (75 days).  Plaintiff alleges that his conditions of

confinement at SCMJ were unconstitutional as he was only a civil detainee, not a criminal

prisoner.  Plaintiff describes dozens of different conditions that he deems were unconstitutional

based on his status as a SVP detainee.  However, many of plaintiff's allegations are repeated,

overlap or are related.  Plaintiff then lists sixteen causes of action, though it is not clear which

cause of action relates to which claim or claims.  Plaintiff has only named one defendant in this

case, Sheriff McGinnis, though as will be discussed below there are no allegations that McGinnis

was personally involved in any of the contested conduct nor does the Monell[1] claim survive

summary judgment.  While plaintiff at times identifies other actors in the course of his

complaint, plaintiff chose not to name those actors as defendants.

Regardless, the court will look to the following claims of unconstitutional

conditions:  Custody transfer using handcuffs and restraints, booked under a penal code section,

strip search, provided orange clothing, failure to protect, held in a classroom for two days, held in

a single cell, held in a double cell, denial of property, commissary was expensive, contact with

criminal inmate workers, denied portions of meals, unsanitary food, no sex offender treatment,

denial of dayroom and recreation, laundry not done frequently enough, denial of telephone

service and mail, visiting was done behind glass, denial of law library access, inadequate medical

care and denial of religious services.

II.  Motion for Summary Judgment

Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists "no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).

\\\\\

\\\\\

---

[1] Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018 (1978).

1       Under summary judgment practice, the moving party

2       always bears the initial responsibility of informing the district court
3       of the basis for its motion, and identifying those portions of "the
        pleadings, depositions, answers to interrogatories, and admissions
        on file, together with the affidavits, if any," which it believes
4       demonstrate the absence of a genuine issue of material fact.

5   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

6   P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

7   issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

8   depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment

9   should be entered, after adequate time for discovery and upon motion, against a party who fails to

10  make a showing sufficient to establish the existence of an element essential to that party's case,

11  and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552.

12  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

13  necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment

14  should be granted, "so long as whatever is before the district court demonstrates that the standard

15  for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at

16  2553.

17      If the moving party meets its initial responsibility, the burden then shifts to the

18  opposing party to establish that a genuine issue as to any material fact actually does exist. See

19  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

20  (1986). In attempting to establish the existence of this factual dispute, the opposing party may

21  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

22  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

23  contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

24  106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is

25  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

26  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

3

1   Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

2   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

3   nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

4           In the endeavor to establish the existence of a factual dispute, the opposing party

5   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

6   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

7   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

8   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

9   genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

10   56(e) advisory committee's note on 1963 amendments).

11           In resolving the summary judgment motion, the court examines the pleadings,

12   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

13   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

14   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

15   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

16   at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

17   obligation to produce a factual predicate from which the inference may be drawn.  See Richards

18   v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

19   (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

20   simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

21   taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

22   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

23           On April 21, 2011, and July 10, 2012,[2] the court advised plaintiff of the

24

25           [2] Plaintiff was reminded of the requirements in light of Woods v. Carey, --- F.3d ----,
    2012 WL 2626912 (9th Cir. July 6, 2012), and given an additional opportunity to file evidentiary
26   submissions.  Plaintiff has submitted additional evidence (Doc. 43) that the court has reviewed.

requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

The above advice would, however, seem to be unnecessary as the Ninth Circuit has held that procedural requirements applied to ordinary litigants at summary judgment do not apply to prisoner pro se litigants.  In Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010), the district courts were cautioned to "construe liberally motion papers and pleadings filed by *pro se* inmates and ... avoid applying summary judgment rules strictly."  Id. at 1150.  No example or further definition of "liberal" construction or "too strict" application of rules was given in Ponder suggesting that any jurist would know inherently when to dispense with the wording of rules. Since the application of any rule which results in adverse consequences to the pro se inmate could always be construed in hindsight as not liberal enough a construction, or too strict an application, it appears that only the essentials of summary judgment, i.e., declarations or testimony under oath, and presentation of evidence not grossly at odds with rules of evidence, need be submitted by the pro se party.

Undisputed Facts

The following of defendant's undisputed facts (DUF) are either not disputed by plaintiff, or following the court's review of the evidence submitted, have been deemed undisputed:

Plaintiff was convicted for child molestation in 1979 and 1981.  DUF #1.  He was sentenced to 25 years and was released from prison in 1994.  Id.  Pursuant to California Welfare & Institutions Code sections 6600 et seq., plaintiff was deemed a sexually violent predator and transferred to the custody of the Department of Mental Health.  DUF #2.  During the relevant time, plaintiff was housed at Coalinga State Hospital before being transferred to SCMJ.  DUF #3. At the relevant times plaintiff did not have any criminal charges pending and was not serving a criminal sentence.  DUF #5.  Sacramento County Main Jail is a maximum security facility, that

houses a wide variety of inmates.  DUF #6.  At maximum capacity SCMJ can hold 2,432 inmates and is often at or near maximum capacity at all times.  DUF #6.  In 2010, there were on average four to six SVP detainees at SCMJ at a time.  DUF #48.  In order to effectively and safely operate the facility, an entire area that normally holds 64 people cannot be shutdown just to hold four to six SVP detainees.  DUF #50.  As a result, other classifications of detainees must be housed in the same area as SVP detainees such as mentally disordered offender inmates.  DUF #53.  An inmate who has a criminal history of sex and violence against children is likely to be targeted by other inmates.  DUF #54.  In 2010 it was the policy of SCMJ to classify and place SVP detainees and other civil sub-classifications such as mentally disordered offenders in the 3 East area.  DUF #55.  This area is the most convenient as well as the least restrictive area of the jail, as it is on the same floor and therefore provides easier access to the law library, social workers and psychiatric services.  DUF #56.

Sacramento County Main Jail has an ongoing battle to stop contraband from entering the facility, such as drugs, guns, weapons, food, pornographic magazines, or alcohol. DUF #8.  Contraband can be transported into the facility either by swallowing it, inserting it into areas of the body or visitors can pass objects at the facility or while at court proceedings.  Id.  It is just as possible for a criminal or civil detainee to smuggle contraband.  DUF #10.  As a result, inmates and their cells are searched.  DUF #11.

On June 5, 2010, plaintiff was transported from Coalinga State Hospital to SCMJ. DUF #88.  A similar transfer occurred on July 22, 2010, and September 2, 2010.  DUF #89, 90. For all transfers, plaintiff was placed in handcuffs, a security belly/waist chain and ankle cuffs for the van transportation.  DUF #92.  Each trip took approximately three hours.  DUF #92.  Plaintiff did not request any stops for a restroom or meal for the approximately three hour trips.  Id. Plaintiff was not allowed to bring the following items: DVD player, Palm PDA and wireless keyboard, Play Station Portable gaming device, DVDs, CDs, SD chips, thumb drives, pens, photo albums and shoes.  DUF #93.

1   Upon arriving at SCMJ inmates remain handcuffed while the transporting officer

2   completed paperwork and the booking process.  DUF #19.  The holding tank for the booking

3   process can hold up to fourteen people, though that amount varies.  DUF #95.  Plaintiff's

4   booking sheet cited California Penal Code § 2620 as the reason for his presence at SCMJ.  DUF

5   #96.  Plaintiff believes that all the other individuals at booking were criminal prisoners and he

6   objects to being placed with them temporarily.  DUF #98.

7   On all three arrivals, plaintiff was strip searched in that he was required to

8   undress, then bend at the waist while spreading his buttocks to display his rectum, squat naked

9   and cough several times, and lift his scrotum and penis to allow visual inspection.  DUF #100.

10  Plaintiff was then forced to place his fingers inside his mouth pulling his lips away from the

11  gums while sticking his tongue out and then remove his upper partials for viewing.  Id.  The

12  search was conducted by two male deputies who never physically touched him during the search.

13  DUF #101.  While there were approximately seven other inmates in the room at the time,

14  plaintiff stood between two metal partitions which obstructed him from view of the other

15  inmates.  Id.  Plaintiff was then given orange clothing the same clothing worn by all individuals

16  except those awaiting transfer to US Immigration and Customs Enforcement, who wear green.

17  DUF #102.  New inmates received one shirt, one undershirt, one pair of pants, one pair of socks,

18  one pair of shoes, one towel and one complete set of undergarments.  DUF #27.  Plaintiff takes

19  issue with the fact that he was given orange clothing which did not distinguish him as a civil

20  detainee.  DUF #103.  Plaintiff was then taken to 3 East.  DUF #104.

21  Plaintiff contends he was tortured by the smell of his cellmate defecating and the

22  sound of his cellmate masturbating.  DUF #105.  Plaintiff also objects to being placed in a single

23  cell in isolation from July 27, 2010, to August 5, 2010.  DUF #106.  Plaintiff states that for some

24  meals, certain components of the meal were no longer available by the time he received the meal.

25  DUF #107.  Plaintiff does not know how often or when this occurred.  Id.  Plaintiff claims that

26  criminal inmate workers failed to wash their hands and used unsanitary food handling practices

when serving food to inmates.  DUF #108.  Plaintiff admits he did not observe the workers'

sanitation practices, other than they sometimes touched his food while wearing gloves, but the

gloves were sometimes dirty.  DUF #109.

The number of inmates given access to the dayroom varies between one and

thirty depending on the classification of the inmates.  DUF #39.  The dayroom is not utilized

twenty-four hours per day.  DUF #40.  When inmates are using the dayroom no other groups of

inmates are allowed access except inmate workers who need to walk through the area to obtain

supplies for their job or to complete their tasks.  DUF #43, 44.  Outdoor recreation is also limited

to around 30-32 people due to security concerns.  DUF #46.  When large groups of inmates are in

the same area more fights and assaultive behavior occurs.  DUF #47.

Plaintiff was housed at SCMJ for a total of 137 days.  DUF #111.  During that

time, he had 89 opportunities for dayroom time, while all other groups of inmates had an average

of 96 opportunities.  Doc. 32, Howard Decl., Exh. F.  However, plaintiff received an average of

77 minutes of dayroom, while all other groups of inmates received an average of 58 minutes of

time.  Id.

Psychiatric treatment is available to all inmates at SCMJ, including individual and

group counseling.  DUF #63, 64.  Plaintiff states that he was not able to continue a Sex Offender

Commitment Program (SOCP), that he had been involved with at Coalinga State Hospital.  DUF

#119.  The SOCP is comprised of multiple components including group therapy, daily

journaling, an empathy book, assessments and 24 hour behavior monitoring.  DUF #118.

Plaintiff had access to paper and writing instruments at SCMJ.  DUF #121.  Plaintiff did not

participate in any other group therapy at SCMJ.  DUF #119.  Plaintiff was briefly denied

vitamins A, D, calcium and triamcinolone cream.  DUF #124.  Plaintiff eventually received all of

those medications.  DUF #125.

SCMJ has a commissary which allows inmates to purchase various items through

the inmate's account.  DUF #61.  In 2010 the commissary was operated by an outside vendor,

1   Aramark Correctional Services.  DUF #62.  Plaintiff disagrees with the prices of commissary

2   items.  DFU #126.  All prisoners at SCMJ were allowed to exchange clothing bedding and linens

3   with the same frequency.  Doc. 33, Daw Decl. ¶ 50.  Outer garments, bedding and linens could be

4   exchanged for clean items once per week.  Id.  Undergarments could be exchanged twice per

5   week.  Id.  Though, inmate workers were permitted to exchange laundry more often as they are

6   required to maintain certain standards for their jobs.  Id.

7            Plaintiff would have preferred to be kept entirely separate from all criminal

8   prisoners.  DUF #129.  Plaintiff came into occasional contact with criminal prisoners who were

9   given extra responsibilities and allowed to have jobs such as distributing meals, cleaning the jail,

10  and exchanging clean and dirty laundry.  DUF #130.

11           Plaintiff states he was unable to call toll free numbers and area codes.  DUF #131.

12  Telephone calls from SCMJ can be monitored, though it is not clear if any of plaintiff's phone

13  calls were monitored.  DUF #132.  Mail may be read at SCMJ, though it is not clear if plaintiff's

14  mail was read.  DUF # 82, 133.  Due to safety and security reasons, including preventing

15  contraband from entering SCMJ, all visitation takes place through a glass wall which separates

16  the inmate from the visitor.  DUF #66.  Plaintiff does not agree with this rule.  DUF #134.

17  Plaintiff also wanted more law library access.  DUF #135.

18           Plaintiff was housed with Roland Gonzalez on July 23, 2010.  DUF #139.

19  Plaintiff met Gonzalez earlier when he stayed at SCMJ in January and February 2010, and in

20  2009.  DUF #140.  On July 25, 2010, plaintiff noticed that Gonzalez began to seem unstable and

21  putting his own commissary items in the toilet.  DUF #141.  There was then a physical

22  altercation between plaintiff and Gonzalez and plaintiff pressed the emergency call button to be

23  placed into contact with jail staff.  DUF #143.  Plaintiff asked jail staff to open the cell door, jail

24  staff complied, and plaintiff exited the cell.  DUF #148.

25           Plaintiff did not want to return to the cell with Gonzalez, so he was handcuffed

26  and taken to a classroom on the same floor as his cell.  DUF #150.  The classroom does not

contain a bathroom, though a bathroom is available on that floor.  DUF #151, 152.  The next

shift of officers arrived who removed the handcuffs and allowed plaintiff to use the bathroom.

DUF #154.  Later plaintiff urinated on the floor of the classroom because he was worried that he

should not bother the officers and ask to use the bathroom.  DUF #155, 156.  It is unclear if

plaintiff again asked to use the bathroom and was denied by jail staff, as plaintiff refused to

provide an answer in his deposition when queried by counsel.[3]  Based on the tortured deposition

testimony the court cannot assume that plaintiff asked to use the restroom and was denied by jail

staff, prompting plaintiff to urinate in the classroom.  Plaintiff stayed in the classroom for two

days.  DUF #157.  There was no mattress or blanket in the classroom, but plaintiff never

requested a blanket or a mattress.  Doc. 32, Exh. B, Plaintiff's Deposition at 149-50.  On July 27,

2010, plaintiff was transferred to a single cell, with no cellmate.  DUF #159.  Plaintiff admits he

preferred being in a single cell.  DUF #160.  Plaintiff also states that being placed in a single cell

for thirteen days was improper isolation.  DUF #161.

       Plaintiff states he was denied access to religious services.  DUF #162.  However,

plaintiff never describes the type of religious services he was denied.  DUF #163.  Plaintiff never

formally requested access to religious services using the proper form.  DUF #165.  Plaintiff states

he was not aware of the form, but made verbal requests.  Opposition to Summary Judgment

(Opposition) at 34.

       <u>Disputed Facts</u>

       Plaintiff generally states that his conditions were too restrictive considering his

status as a civil detainee.

\\\\\

---

       [3] In his deposition plaintiff refused to answer the question instead repeating that he was
fearful to ask to use the bathroom, but he asked.  Doc. 32, Exh. B, Plaintiff's Deposition at 141-
150.  When asked at the deposition if he asked to use the bathroom, plaintiff only replied, "yes
and no."  <u>Id.</u> at 144.  When asked to clarify plaintiff refused, saying he did ask and didn't ask.  <u>Id.</u>
at 146.

1    Analysis

2         Legal Standard

3         As a civil detainee, the applicable standard for plaintiff is not the more restrictive

4    standards for cruel and unusual punishment under the Eighth Amendment; rather, "'the more

5    protective fourteenth amendment standard applies to conditions of confinement when detainees

6    ... have not been convicted' of a crime." Jones v. Blanas, 393 F.3d 918, 931 (9th Cir. 2004),

7    quoting Gary H. v. Hegstrom, 831 F.2d 1430, 1432 (9th Cir. 1987), citing Youngberg v. Romeo,

8    457 U.S. 307, 102 S. Ct. 2452 (1982) (civilly committed individuals), and Bell v. Wolfish, 441

9    U.S. 520, 99 S. Ct. 1861 (1979).

> The Fourteenth Amendment requires the government to do more than provide the "minimal civilized measure of life's necessities," Rhodes [v. Chapman], 452 U.S. [337] at 347, 101 S.Ct. 2392, for non-convicted detainees. Rather, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845 [] (1972).

> The case of the individual confined awaiting civil commitment proceedings implicates the intersection between two distinct Fourteenth Amendment imperatives. First, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg, 457 U.S. at 321-22, 102 S.Ct. 2452. Second, when the state detains an individual on a criminal charge, that person, unlike a criminal convict, "may not be *punished* prior to an adjudication of guilt in accordance with due process of law.'" Bell, 441 U.S. at 535, 99 S.Ct. 1861 (emphasis added); see also Demery v. Arpaio, 378 F.3d 1020, 1029 (9th Cir.2004) ("[T]he Fourteenth Amendment prohibits all punishment of pretrial detainees."). As civil detainees retain greater liberty protections than individuals detained under criminal process, see Youngberg, 457 U.S. at 321-24, 102 S.Ct. 2452, and pre-adjudication detainees retain greater liberty protections than convicted ones, see Bell, 441 U.S. at 535-36, 99 S.Ct. 1861, it stands to reason that an individual detained awaiting civil commitment proceedings is entitled to protections at least as great as those afforded to a civilly committed individual and at least as great as those afforded to an individual accused but not convicted of a crime.

Jones v. Blanas, 393 F.3d at 931-932.

11

1    In <u>Jones v. Blanas</u>, where the plaintiff was, like plaintiff herein, an individual

2    detained in a county jail awaiting involuntary civil commitment proceedings under the SVPA, the

3    Ninth Circuit found "that the conditions of confinement for an individual detained under civil

4    process but not yet committed must be tested by a standard at least as solicitous to the rights of

5    the detainee as the standards applied to a civilly committed individual and to an individual

6    accused but not convicted of a crime." <u>Id.</u>, at 932.

7    While the <u>Jones</u> Court noted that the Eleventh Circuit[4] has gone so far as to hold

8    that it is unconstitutional for individuals awaiting involuntary civil commitment proceedings to

9    be held in jail at all, the Ninth Circuit did not venture so far, but asserted that "[a]t a bare

10    minimum," such an individual cannot be subjected to conditions amounting to punishment. <u>Id.</u>,

11    at 932 [citations omitted].

12    Because a person detained pending confinement under the SVPA is a civil

13    detainee, "an SVPA detainee is entitled to 'more considerate treatment' than his criminally

14    detained counterparts." <u>Id.</u>, citing <u>Youngberg</u>, 457 U.S. at 321-22.  "[W]hen a SVPA detainee is

15    confined in conditions identical to, similar to, or more restrictive than, those in which his

16    criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'"

17    <u>Id.</u>, citing <u>Sharp v. Weston</u>, 233 F.3d 1166, 1172-73 (9th Cir. 2000) (<u>Youngberg</u> required that

18    those civilly confined at a commitment center must receive "more considerate" treatment than

19    inmates at a correctional center where the commitment center was located).

20        In sum, a civil detainee awaiting adjudication is entitled to
conditions of confinement that are not punitive. Under <u>Bell</u> and our

21    circuit precedent, a restriction is "punitive" where it is intended to
punish, or where it is "excessive in relation to [its non-punitive]

22    purpose," <u>Demery</u>, 378 F.3d at 1028..., or is "employed to achieve
objectives that could be accomplished in so many alternative and

23    less harsh methods," <u>Hallstrom</u>, 991 F.2d at 1484.... With respect
to an individual confined awaiting adjudication under civil process,

24    a presumption of punitive conditions arises where the individual is
detained under conditions identical to, similar to, or more

25

26    [4] See <u>Lynch v. Baxley</u>, 744 F.2d 1452 (11th Cir. 1984).

restrictive than those under which pretrial criminal detainees are
held, or where the individual is detained under conditions more
restrictive than those he or she would face upon commitment.
Finally, to prevail on a Fourteenth Amendment claim regarding
conditions of confinement, the confined individual need not prove
"deliberate indifference" on the part of government officials.

Jones v. Blanas, 393 F.3d at 933-34.

However, if a particular condition or restriction is "reasonably related to a
legitimate governmental objective, it does not, without more, amount to 'punishment.'" Bell,
441 U.S. at 539.  Defendants must be afforded an opportunity to demonstrate legitimate,
non-punitive interests justifying the conditions of detainees awaiting SVPA proceedings, and by
showing that the restrictions imposed on such detainees were not excessive in relation to these
interests.  Jones, 393 F.3d at 934–35.  Legitimate non-punitive governmental objectives include
'maintaining security and order' and 'operating the [detention facility] in a manageable fashion.'"
Pierce v. County of Orange, 526 F.3d 1190, 1205 (9th Cir. 2008) (quoting Bell, 441 U.S. at 540
n. 23).  While the court understands that civil detainees are not precisely similarly situated to
pretrial detainees, Clouthier v. County of Contra Costa, 591 F.3d 1232, 1243-44 (9th Cir. 2010),
citing Jones v. Blanas, this recognition is made with the common sense understanding that a jail
cannot cease to become a jail when SVP detainees are housed therein, and plaintiff does not
assert a viable claim by demanding better and differentiated treatment in every respect of his
housing.  If the rule were such, the Jones v. Blanas holding that SVP detainees can be held in a
jail would have no practical effect, especially in that the SVP detainees are in jail for only
relatively short periods of time.

Discussion[5]

This court notes that there is a lack of guidance on what constitutes punitive

_____

[5] Defendant has filed a list of 104 individual objections to plaintiff's evidence and
exhibits.  As plaintiff is proceeding pro se, all 104 objections will be overruled and the court will
review all of plaintiff's evidence and exhibits.

1   confinement in these types of cases.  The Ninth Circuit was clear that unlike the Eleventh Circuit,

2   it is not unconstitutional for individuals waiting involuntary civil commitment proceedings to be

3   held in jail with criminal prisoner and detainees.  Thus, detainees and prisoners are at times held

4   in the same facilities, but the treatment of detainees must not be punitive or restrictive and they

5   must receive more considerate treatment.  However, there is little case law defining restrictive

6   and considerate.

7          The Ninth Circuit stated in Hydrick v. Hunter, 500 F.3d 978 (9th Cir. 2007),

8   vacated on other grounds, 129 S.Ct.  2431, that "[w]e acknowledge at the outset that it is not

9   always clearly established how much more expansive the rights of civilly detained persons are

10  than those of criminally detained persons.  As discussed below, the rights afforded civilly

11  detained persons are flexible enough to take into account the circumstances of detention.  The

12  law generally requires a careful balancing of the rights of individuals who are detained for

13  treatment, not punishment, against the state's interests in institutional security and the safety of

14  those housed at the facility. [Citations omitted]. Id., at 990.

15         In the instant case, plaintiff has set forth dozens of examples of what he considers

16  to be more restrictive and less considerate treatment, such as having to wear orange clothes. It

17  should also be noted that plaintiff assumes any inmate not a SVP, was a convicted prisoner, when

18  in fact SCMJ holds many pre-trial detainees.  Therefore, plaintiff's assertions that he was being

19  treated the same as criminal prisoners is therefore flawed as many of these people were pre-trial

20  detainees similarly situated to plaintiff.  Regardless, the court will address plaintiff's claims

21  below.

22         Plaintiff seeks money damages and injunctive relief, however the injunctive relief

23  requests are difficult to discern.  Plaintiff generally states he wishes to only be housed in facilities

24  that provide conditions consistent with those laid out in Jones v. Blanas, and that SCMJ provide

25  conditions consistent with the law including medical and psychological treatment and no more

26  double celling.

1              Transportation to SCMJ

2              In his opposition to summary judgment, plaintiff concedes that his claim

3  regarding the use of restraints during transportation is untenable.  Opposition at 77.[6]  Plaintiff

4  next states he was not allowed to bring the following items to SCMJ: DVD player, Palm PDA

5  and wireless keyboard, Play Station Portable gaming device, DVDs, CDs, SD chips, thumb

6  drives, pens, photo albums and shoes.  Plaintiff does not allege these items were confiscated or

7  taken, simply that he was not allowed to bring them to SCMJ.

8              Plaintiff has a protected interest in his personal property.  Hansen v. May, 502

9  F.2d 728, 730 (9th Cir. 1974).  In this context, the Due Process Clause protects prisoners from

10  being deprived of their property without due process of law.  Wolff v. McDonnell, 418 U.S. 539,

11  556, 94 S.Ct. 2963 (1974).  However, while an authorized, intentional deprivation of property is

12  actionable under the Due Process Clause, neither negligent or "unauthorized intentional

13  deprivations of property gives rise to a violation of the Due Process Clause if the state provides

14  an adequate post-deprivation remedy."  Hudson v. Palmer, 468 U.S. 517, 533 n. 14, 104 S.Ct.

15  3194 (1983).  California provides an adequate post-deprivation remedy that can provide

16  compensation for property loss.  See Barnett v. Centoni, 31 F.3d 813, 816–17 (9th Cir. 1994)

17  (California law provides an adequate post-deprivation remedy for any property deprivations.  See

18  Cal. Gov't.Code §§ 810–895).  In other words, only an authorized intentional deprivation of

19  property is actionable under the Due Process Clause.  Authorized deprivations of property are

20  permissible if carried out pursuant to a regulation that is reasonably related to a legitimate

21  penological interest.  Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987).

22              In the instant case plaintiff did not lose any property or have property permanently

23  confiscated, rather he was not allowed not bring his DVD player, I-Pod and other assorted

24  electronics to the jail.  This fails to state a constitutional claim as this was not a punitive action

25  ─────────────────

26      [6] While plaintiff does state that defendant could have used soft restraints, plaintiff does
not present this as a claim.

1    and no property was permanently taken.

2    <u>Booking Process</u>

3    Plaintiff states that being booked in SCMJ under Penal Code § 2620 violated the

4    Fourteenth Amendment.  California Penal Code § 2620 states:

5    When it is necessary to have a person imprisoned in the state prison brought
     before any court to be tried for a felony, or for an examination before a grand jury
6    or magistrate preliminary to such trial, or for the purpose of hearing a motion or
     other proceeding, to vacate a judgment, an order for the prisoner's temporary
7    removal from said prison, and for the prisoner's production before such court,
     grand jury or magistrate, must be made by the superior court of the county in
8    which said action, motion, or examination is pending or by a judge thereof; such
     order shall be made only upon the affidavit of the district attorney or defense
9    attorney, stating the purpose for which said person is to be brought before the
     court, grand jury or magistrate or upon the court's own motion. The order shall be
10   executed by the sheriff of the county in which it shall be made, whose duty it shall
     be to bring the prisoner before the proper court, grand jury or magistrate, to safely
11   keep the prisoner, and when the prisoner's presence is no longer required to return
     the prisoner to the prison from whence the prisoner was taken; the expense of
12   executing such order shall be a proper charge against, and shall be paid by, the
     county in which the order shall be made.
13

14   Plaintiff objects as the code refers to the person as a "prisoner" and plaintiff was

15   not a prisoner.  As this only appeared on plaintiff's paperwork, there was no punitive effect on

16   plaintiff and no intent from defendant.

17   Plaintiff also states that being issued orange clothing similar to criminal prisoners

18   was a constitutional violation as he appeared to be a prisoner.  Yet, there is no evidence that

19   plaintiff being required to wear the same color clothing as prisoners (including a great number of

20   pre-trial detainees) was done for punitive reasons.  Defendant notes that most inmates are given

21   the same color for simplicity and safety.  Defendant also contends, and it is undisputed and

22   generally known that SVP detainees or other inmates who have a criminal history of sex and

23   violence against children are likely to be targeted by other inmates.  It seems a wise safety

24   measure that SVP detainees are not singled out and identified with different color clothing.

25   Summary judgment is granted for defendant on this claim.

26   \\\\\

1    Plaintiff also objects to the strip search he endured when he was booked into

2 SCMJ on each separate occasion.  It is undisputed that it was only a visual search.  The Fourth

3 Amendment right to be secure against unreasonable searches and seizures extends to detainees

4 who are sexually violent predators.  Hydrick v. Hunter, supra, 500 F.3d at 993.  The test of

5 "reasonableness" under the Fourth Amendment requires the court to "consider the scope of the

6 particular intrusion, the manner in which it is conducted, the justification for initiating it, and the

7 place in which it is conducted."  Bell, 411 U.S. at 559.

8    In recently ruling on the propriety of strip searches for pretrial detainees, indeed, a

9 detainee who was being held for a traffic law violation, the Supreme Court held that strip

10 searches in county jail facilities were not unconstitutional.  Florence v. Brd. of Chosen

11 Freeholders etc., __U.S.__, 132 S.Ct. 1510 (2012).  That rule of law decides this case as plaintiff

12 would have no greater rights than a pretrial detainee in respect to searches in the jail facility.[7]

13    Cell

14    Plaintiff also alleges Fourteenth Amendment violations with respect to many

15 aspects of his cell, in that he was forced to share the cell with another inmate.  As a result,

16 \\\\\

17 \\\\\

18 \\\\\

19

20    [7] The court does not find that Florence can be distinguished on the basis  that plaintiff, who has sometimes contact with other "prisoners" in the jail, prisoners which include pretrial detainees and convicted misdemeanants (and now felons transferred under the recent prison overcrowding realignment procedures in California) is not part of the "general population" of the Sacramento County Jail, as for the most part, he is kept separate from other non-special needs inmates.  As plaintiff complains, his conditions of confinement cannot be differentiated from the run of the mill detainee who is routinely strip searched in the jail upon entry to that facility. More importantly, plaintiff does not offer any persuasive argument that he should be considered less of a security risk than a pretrial detainee, e.g., it is commonly known that prisoners/committees from state institutions can craft ingenious weapons, or have access to unlawful drugs, which they also ingeniously hide.  Plaintiff does not allege that he is not subject to strip searches at his primary institution; indeed he alludes to such a search when transferred from Coalinga.  Why would it be any different when he is transferred to another institution temporarily?

1    plaintiff alleges he was forced to endure the smell of his cell mate defecating and the sound of

2    him masturbating.[8]

3           However, plaintiff's assertions that sharing a cell with only one other person does

4    not rise to the level of a harm or disability with which the constitution is concerned.  See Bell,

5    441 U.S. at 539, n. 21, 99 S.Ct. 1861 ("There is, of course, a de minimis level of imposition with

6    which the Constitution is not concerned.").  Some crowding and loss of freedom of movement is

7    one of the inherent discomforts of confinement.  Id. at 537; see also Demery v. Arpaio, 378 F.3d

8    1020, 1030 (noting that Bell determined that "the additional discomfort of having to share the

9    already close corners with another detainee was not sufficiently great to constitute punishment.").

10   Even if having one cell mate was to constitute more than de minimis harm, there is no evidence

11   that the condition was intended to punish or was excessive in relation to a non-punitive purpose.[9]

12   After the altercation with his cellmate, plaintiff was placed in a single cell for thirteen days.

13   Despite plaintiff's objections to sharing a cell, plaintiff also objects to the single cell for thirteen

14   days.  Not having a cellmate for thirteen days fails to demonstrate a constitutional deprivation,

15   especially after plaintiff opposed having a cellmate.  Plaintiff also states in his deposition that he

16   preferred not having a cellmate.  Doc. 32, Exh. B, Plaintiff's Deposition at 154.  Summary

17   judgment is granted on these claims.

18         Jail Life

19           Plaintiff generally argues that he should have been afforded more access to the

20   law library and that other facilities provide more access to the law library for SVP detainees.

21   Plaintiff also argues that because there were close to 2,400 prisoners and only approximately 6

---

23      [8] Plaintiff also notes that the toilet at SCMJ was manufactured by Bradley and was cold to
24 the touch, and he preferred the Kohler made toilet at Coalinga State Hospital.  Complaint at 13.
    This allegation demonstrates the paucity of merit in all of plaintiff's claims.

25      [9] It also appears that plaintiff has conceded that summary judgment should be granted on
    this claim, though plaintiff does note that other county jails have single cells for SVP inmates.
26 Opposition at 63.

1   SVP inmates, criminal prisoners were provided more access when the times are aggregated and

2   compared.  Plaintiff has failed to demonstrate that his limited law library access was punitive in

3   nature.  Defendant notes that all 2,400 inmates must be provided access to the law library, and as

4   already noted SVP inmates are kept separate from other inmates, therefore, plaintiff could not be

5   provided unlimited access to the law library.  While it is possible plaintiff could have been

6   provided more access to the law library, that would have involved plaintiff interacting with

7   criminal prisoners, which plaintiff states would be a violation of his constitutional rights and

8   defendant notes could be dangerous.

9           Nor has plaintiff presented a viable claim for denial of access to the courts.

10  Prisoners have a constitutional right to be afforded "a reasonably adequate opportunity to present

11  claimed violations of fundamental constitutional rights to the courts."  Lewis v. Casey, 518 U.S.

12  343, 351, 116 S.Ct. 2174 (1996).  This right applies to prisoners' challenges to their convictions

13  or sentences or conditions of confinement.  Id. at 354.  Prison officials may not "actively

14  interfer[e] with inmates' attempts to prepare legal documents or file them."  Id. at 350.  To

15  establish a claim for any violation of the right of access to the courts, prisoners must prove an

16  actual injury by showing that their efforts to pursue a non-frivolous claim concerning their

17  conviction or conditions of confinement has been hindered.  Id. at 350-55.  Plaintiff has not

18  presented any evidence that any lawsuits or cases were in anyway hindered other than stating he

19  filed several habeas petitions that were denied, but provides no specific details.  Summary

20  judgment is granted for defendant.

21          It is undisputed that all prisoners at SCMJ were allowed to exchange clothing,

22  bedding and linens with the same frequency.  Outer garments, bedding and linens could be

23  exchanged for clean items once per week.  Undergarments could be exchanged twice per week.

24  Though, inmate workers were permitted to exchange laundry more often as they are required to

25  \\\\\

26  \\\\\

19

1    maintain certain standards for their jobs and they were allowed to shower more often.[10]

2            The constitution imposes a duty on jail officials to ensure that detainees are

3    provided adequate clothing, bedding, and sanitation.  See Farmer v. Brennan, 511 U.S. 825, 832,

4    114 S.Ct. 1970 (1994); Touissant v. McCarthy, 597 F.Supp. 1388, 1410-11 (N.D.Cal.1984),

5    rev'd in part on other grounds, 801 F.2d 1080 (9th Cir. 1986) (holding jail officials "under an

6    obligation to ensure that ... clothing ... is adequately laundered" and that bedding is "reasonably

7    clean [and] sanitary" and the Eighth Amendment is violated when weeks and months pass

8    without a clothing exchange).  It is clear from the record that plaintiff was provided clean clothes

9    in a timely manner and there were legitimate reasons why some other prisoners received clean

10   clothing more regularly and could shower more often.  Summary judgment is granted as

11   plaintiff's assertions do not present a constitutional claim.

12           Plaintiff argues that at Coalinga State Hospital he was allowed to seal his

13   envelopes prior to mailing, but was not allowed to do this at SCMJ.  Prisoners and civilly

14   committed persons have a First Amendment right to send and receive mail.  Robinson v. Joya,

15   2010 WL 890437, at *6 (E.D. Cal. 2010) (citing  Thornburgh v. Abbott, 490 U.S. 401, 407, 109

16   S.Ct. 1874 (1989)); see also Valdez v. Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002).

17   Restrictions on prisoners' mail are analyzed under the reasonableness standard set forth in Turner

18   v. Safley, 482 U.S. 78,89–91, 107 S.Ct. 2254 (1987).  "Interference is valid if it is reasonably

19   related to legitimate penological interests."  Safley, 482 U.S. at 89.  For a civil detainee, "any

20   restrictions on his First Amendment rights to send and receive mail must be non-punitive."

21   Robinson, 2010 WL 890437, at *7 (citing Hydrick, 500 F.3d at 989; Jones, 393 F.3d at 932).  To

22   show that restrictions are punitive, a plaintiff must show "that the challenged restrictions are

23   expressly intended to punish, the restrictions serve a non-punitive purpose but are nonetheless

24   excessive, or that the legitimate purpose could be accomplished with less restrictive or harsh

25

26           [10] Plaintiff does not state he wanted to be an inmate worker, rather they received extra
     benefits for their jobs that he did not.

20

1   methods." Id. (Citing Jones, 393 F.3d at 932; Bell, 441 U.S. at 539).  Plaintiff has failed to show

2   that not being allowed to seal his envelopes was a restriction let alone punitive.

3          Plaintiff also objects to the visits from outsiders being conducted through glass.

4   Inmates and by extension civil detainees have the right to communicate with people outside the

5   jail.  Valdez v. Rosenbaum, 302 F.3d 1039, 1048 (9th Cir. 2002).  Pretrial detainees do not have

6   a right to unfettered visitation.  See Block v. Rutherford, 468 U.S. 576, 585–89, 104 S.Ct. 3227

7   (1984) (upholding a blanket prohibition on contact visitation for pretrial criminal detainees as

8   reasonably related to a legitimate government interest in security).  At a minimum, SVP's must

9   be afforded the same rights afforded prisoners confined in a penal institution.  Hydrick v. Hunter,

10  500 F.3d 978, 998 (9th Cir. 2007).  However, many liberties and privileges enjoyed by other

11  citizens must be surrendered when one is rightfully incarcerated, either as an inmate or an SVP.

12  See Overton v. Bazzetta, 539 U.S. 126, 131, 123 S.Ct. 2162 (2001).  Put simply, "[a] n inmate

13  does not retain rights inconsistent with proper incarceration."  Id.  Defendant has provided a

14  legitimate non punitive reason for having visits occur between glass, to insure the safety of the

15  entire facility.  Therefore, summary judgment is granted on this claim.

16         Plaintiff's claims regarding the telephone use are difficult to discern.  Plaintiff

17  states his telephone calls may have been monitored, though he does not know for certain, the

18  SCMJ telephone network did not accept his calling card,  he could not dial 800 numbers and he

19  could not call area codes, though he could make phone calls.  As plaintiff has failed to

20  sufficiently describe these claims or sufficiently oppose summary judgment regarding them,

21  summary judgment is granted.

22         Plaintiff next claims that criminal inmate workers failed to wash their hands and

23  used unsanitary food handling practices when serving food to inmates.  However, it is undisputed

24  that plaintiff did not observe the workers sanitation practices, other than they sometimes touched

25  his food while wearing gloves, but the gloves were sometimes dirty.  Summary judgment is

26  granted for defendant as this claim is meritless and plaintiff has not addressed defendant's

1   argument in his opposition.

2        Plaintiff also states that he was denied participation in religious services.  Despite

3   defendant noting that plaintiff never submitted an inmate request for religious services, which

4   plaintiff does not dispute, plaintiff provides no further evidence or arguments describing this

5   denial of access.  Plaintiff has not even stated what type of religious services he was denied or

6   even what is his religion.  Summary judgment is granted for defendant.

7        Plaintiff states that for some meals, certain components of the meal were no

8   longer available by the time he received the meal.  Plaintiff believes the SCMJ commissary is

9   more expensive than at Coalinga State Hospital, though it is undisputed that the commissary was

10  operated by an outside vendor, Aramark Correctional Services, that is not a party to this action.

11  None of these allegations demonstrate any punitive action against plaintiff and are far too

12  insignificant to warrant a discussion of a constitutional violation, therefore summary judgment is

13  granted.

14        Medical Care

15        Plaintiff states that the medical care he received was inadequate, in that he did not

16  receive vitamin A, vitamin D, calcium, and triamcinolone cream for his psoriasis as often as he

17  wanted and not in the first three days.

18        As a civil detainee, plaintiff's right to medical care is protected by the substantive

19  component of the Due Process Clause of the Fourteenth Amendment.  See Youngberg v. Romeo,

20  457 U.S. 307, 315, 102 S.Ct. 2452 (1982).  Under this provision of the constitution, plaintiff is

21  "entitled to more considerate treatment and conditions of confinement than criminals whose

22  conditions of confinement are designed to punish." Jones v. Blanas, 393 F.3d 918, 931 (9th Cir.

23  2004) (quoting Youngberg, 457 U.S. at 321–22).   Thus, to avoid liability, defendant's medical

24  decisions regarding plaintiff's treatment must be supported by "professional judgment."

25  Youngberg, 457 U.S. at 321.  A defendant fails to use professional judgment when her decision

26  is "such a substantial departure from accepted professional judgment, practice, or standards as to

1  demonstrate that [she] did not base [her] decision on such a judgment." Id. at 323.

2          In determining whether defendant has met his constitutional obligations, decisions

3  made by the appropriate professional are entitled to a presumption of correctness. Youngberg,

4  457 U.S. at 324. "[T]he Constitution only requires that the courts make certain that professional

5  judgment in fact was exercised. It is not appropriate for the courts to specify which of several

6  professionally acceptable choices should have been made." Id. at 321. Liability will be imposed

7  only when the medical decision "is such a substantial departure from accepted professional

8  judgment, practice, or standards as to demonstrate that the person responsible actually did not

9  base the decision on such a judgment." Id. at 323.

10          Plaintiff has failed to demonstrate that not receiving vitamins or psoriasis

11  medication for the first three days, or often as he wanted, was a substantial departure from

12  accepted professional judgment. Based on the facts and arguments set forth in the instant

13  motions, summary judgment is granted for defendant.

14          Mental Health

15          It is undisputed that psychiatric treatment is available to all inmates at SCMJ,

16  including individual and group counseling. Though, it is also undisputed that plaintiff was

17  unable to continue with the formal Sex Offender Commitment Program (SOCP), that he had

18  been involved with at Coalinga State Hospital. The SOCP is comprised of multiple components

19  including group therapy, daily journaling, an empathy book, assessments and 24 hour behavior

20  monitoring. Plaintiff did not participate in any other group or individual therapy at SCMJ.

21          The main thrust of plaintiff's claim is that he was unable to continue the formal

22  SOCP that he had previously participated in. However, it is undisputed that plaintiff could have

23  requested counseling, but he chose not to and plaintiff could have continued a journal. Thus, it is

24  clear that plaintiff could have continued with certain aspects of SOCP. Summary judgment is

25  therefore granted as there is no evidence of punitive conduct by defendant.

26  \\\\\

<u>Interaction with Criminal Prisoners</u>

Plaintiff states that his rights were violated as he occasionally interacted with criminal prisoners.  Plaintiff may have been near criminal prisoners when he was booked and certain criminal prisoners were given extra responsibilities and served meals and gave clean laundry to plaintiff or were cleaning the facility near him.  Any other interaction with criminal prisoners was purely accidental.  It is undisputed that plaintiff was never harmed in one of these instances and there are no allegations of any threats against plaintiff.  The altercation with plaintiff's cellmate, who does not appear to be a criminal prisoner, will be discussed below.

Plaintiff's rights to be protected and confined in a safe institution are clearly established.  <u>See</u> <u>Youngberg</u>, 457 U.S. at 319–322 (stating that individuals who are involuntarily civilly committed have constitutionally protected rights under the Due Process Clause to reasonably safe conditions of confinement and freedom from unreasonable bodily restraints).  The right is clearly established for civilly committed persons and prisoners alike.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 833, 114 S.Ct. 1970 (1994).

In this instant case it is undisputed that plaintiff was never harmed or even threatened, rather plaintiff occasionally interacted with criminal prisoners.  As plaintiff suffered no harm, summary judgment is granted to defendant.

<u>Cellmate Altercation</u>

Plaintiff was housed with Roland Gonzalez on July 23, 2010, and plaintiff met Gonzalez earlier when he stayed at SCMJ in January and February 2010, and in 2009.  On July 25, 2010, plaintiff noticed that Gonzalez began to seem unstable and putting his own commissary items in the toilet.  There was then a physical altercation between plaintiff and Gonzalez and plaintiff pressed the emergency call button to be placed into contact with jail staff.  Plaintiff asked jail staff to open the cell door, jail staff complied, and plaintiff exited the cell.

There are no allegations that plaintiff suffered any injuries and it is undisputed that plaintiff never sought any medical care.  Plaintiff only stated Gonzalez, "grabbed or hit me

on the arm and chest areas." Compl., Exh. 5.  Nor are there are any allegations that plaintiff warned prison officials that he was in fear from Gonzalez.[11]  The only allegation is that Gonzalez recently attacked a prior cellmate.  As plaintiff suffered no injuries and plaintiff never informed jail officials that he was in fear of Gonzalez, summary judgment is granted for defendant.

### Time in Classroom

Following the altercation with his cellmate, plaintiff did not want to return to his cell, so he was handcuffed and taken to a classroom on the same floor as his cell.  Plaintiff stayed in the classroom for two days.  There was no mattress or blanket in the classroom, but plaintiff never requested a blanket or a mattress.  On July 27, 2010, plaintiff was transferred to a single cell, with no cellmate.

Courts have held that the failure to provide inmates with beds or mattresses is actionable under the Eighth and Fourteenth Amendments.  Thompson v. City of Los Angeles, 885 F.2d 1439, 1448 (9th Cir. 1989) (citations omitted) rev'd in part on other grounds, ("[Plaintiff's] uncontroverted allegation that he was provided with neither a bed nor even a mattress [for two nights] unquestionably constitutes a cognizable Fourteenth Amendment claim."); Thomas v. Baca, 514 F.Supp.2d 1201, 1215 (C.D.Cal. 2007) (holding that "the practice of requiring inmates to sleep on the floor of LASD jails violates the Eighth Amendment").

Pursuant to the authority cited above, it is clear that plaintiff sleeping on the floor for two nights is a constitutional deprivation.  In the complaint, plaintiff identified several of the jail guards by name responsible for the lack of a bed.  However, plaintiff specifically chose not to name these guards as defendants, instead only naming the sheriff himself, McGinnis, as defendant.[12]  Plaintiff was quite clear in the complaint that McGinnis was the final policy maker

---

[11] Gonzalez claims that plaintiff attacked him.

[12] In the caption of the complaint, plaintiff stated John Does 1-50, though plaintiff provided no other information about these Doe defendants.  Most importantly, plaintiff, who knew the names of the potential defendants, chose not to make them part of this action.  It is also well beyond the appropriate time for the complaint to be amended to add these defendants.

1   and it was his policies, practices and customs that led to the many alleged constitutional

2   violations.  Plaintiff essentially has brought a claim pursuant to Monell v. New York City Dep't

3   of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018 (1978), not the individual actors, which

4   is well within plaintiff's right.  As will be discussed below, while plaintiff has identified an

5   idiosyncratic constitutional violation, which occurred as a result of a one-time event, he has

6   failed to link the named defendant in this case to the deprivation as required by 42 U.S.C. § 1983,

7   nor has plaintiff set forth a Monell claim with respect to sleeping without a bed for two nights,

8   that can survive summary judgment.[13]

9           Recreation

10           Plaintiff was housed at SCMJ for 137 days, and it is undisputed that during that

11   time he had 89 opportunities for dayroom time and received an average of 77 minutes per

12   dayroom opportunity.  It is also undisputed that other prisoners received 96 opportunities for

13   dayroom, but only had an average of 58 minutes per dayroom opportunity.  Over the course of his

14   time at SCMJ plaintiff received an extra 1,285 minutes, or 21 hours of dayroom time than the

15   other prisoners.

16           Both the motion for summary judgment and plaintiff's opposition contain very

17   little regarding outdoor recreation.  Defendant states that plaintiff received on average 70 minutes

18   per outdoor recreation opportunity compared to other inmates who received an average of 63

19   minutes per opportunity.  DUF #115, 116.  Plaintiff argues that some other inmates received

20   more outdoor time and requests to reopen discovery to prove this.  Defendant, while noting the

21   minutes per outdoor recreation opportunity, fails to mention how many outdoor opportunities

22   civil detainees and other inmates received.  Thus, while plaintiff may have received seven more

23   minutes per outdoor opportunity, it is not clear if other inmates and specifically criminal

24

25           [13] Even if it was undisputed that plaintiff did not have access to a bathroom while in the
     classroom, the claim would fail for the same reasons as plaintiff has not identified a viable
26   defendant.

1   prisoners received 20 more opportunities.

2          While defendant chose not to present this information, defendant did include

3   records of outdoor recreation time during the relevant period and the year prior.  Doc. 32, Exhs.

4   D, E.  The undersigned has attempted to properly interpret the records to the best of his ability.

5   During the 137 days of his stay, plaintiff had 10 opportunities for outdoor recreation.  Doc. 32,

6   Exh. E.  While the amount of time was not always logged, most were, and plaintiff received an

7   average of 70 minutes each.  Id.

8          With respect to the other groups, the records indicate the outdoor recreation for

9   the other housing units, but of course it is not clear what housing units contain pre-trial detainees

10  or convicted prisoners.  The records describe six other housing units and the different housing

11  units were each provided were with differing amounts of outdoor recreation time and different

12  numbers of opportunities.  On average, there were about 19 opportunities for about 66 minutes

13  each.[14]  Thus, plaintiff received less outdoor exercise time than other prisoners.

14         However, plaintiff did receive more time out of his cell, both dayroom and

15  outdoor exercise time that all others.  Combined, plaintiff was provided with about 7,553

16  minutes of recreation outside his cell or nearly 126 hours during his 137 day stay.  By contrast,

17  all other inmates received about 6,822 minutes or 113 hours.

18  _____

19         [14] It seems from January 6, 2010, to February 18, 2010, civil detainees received two
    opportunities for outdoor recreation, for 65 minutes on January 30, 2010, and 38 minutes on
20  February 6, 2010.  Doc. 32, Exh. E: Outdoor Recreation at 1-2.  Civil detainees also refused
    outdoor recreation on two occasions.  During that same time period, different groups of other
21  prisoners received various amounts of opportunities, but approximately 10.  Id.  Not all of the
    opportunities indicate the amount of time spent on they yard, but it appears to be approximately
    60 minutes each time.  Id.  Thus during this 45 day time period civil detainees received 103
22  minutes of outdoor recreation time, while criminal prisoners received about 600 minutes.
    Between July 22, 2010, and August 5, 2010, 15 days, neither civil detainees or any other
23  prisoners were provided with outdoor recreation time.  Doc. 32, Exh. E: Outdoor Recreation at 2.
    From September 2, 2010, to November 18, 2010, civil detainees were provided eight outdoor
24  opportunities and refused one chance.  Id., at 2-5.  The amount of time was not documented for
    all occasions, but it appear on average civil detainees received approximately 77 minutes for each
25  opportunity.  Id.  Criminal prisoners received about nine opportunities for outdoor exercise, and
    the different groups received on average for each occasion approximately 73 minutes.  Id.  For
26  this period the amount of time was about equal.

1        Exercise is one of the basic human necessities protected by the Eighth

2   Amendment.  Hearns v. Terhune, 413 F.3d 1036, 1042 (9th Cir. 2005).  Moreover, the

3   Fourteenth Amendment requires that pre-trial detainees not be denied adequate opportunities for

4   exercise without legitimate governmental objectives.  See also Pierce v. County of Orange, 526

5   F.3d 1190, 1211–12 (9th Cir. 2008).

6        Although the Ninth Circuit did not specify the "minimum amount of weekly

7   exercise that must be afforded to detainees who spend the bulk of their time inside their cells,"

8   the Court held that ninety minutes per week of exercise, which is the equivalent of less than

9   thirteen minutes per day, does not comport with Eighth Amendment standards.  Pierce, 526 F.3d

10  at 1212 (9th Cir. 2008).  The Pierce court eventually required that if detainees spent 22 hours per

11  day in their cells, that they then be provided with at least two hours of exercise per week.  Id. at

12  1213.

13       In the instant case, plaintiff received nearly six hours of time out of his cell each

14  week, more than described in Pierce.  Thus, plaintiff was treated better than most inmates,

15  including, it appears, pretrial detainees.  While during certain periods plaintiff received less

16  outdoor recreation time than other inmates, there is no indication of any punitive actions on

17  behalf of defendant.  Defendant notes that all of the 2,000 or so inmates at SCMJ are required to

18  be provided outdoor recreation, and for safety concerns, plaintiff and other civil detainees cannot

19  be on the yard at the same time.  In addition, only around 30 people are allowed on the yard at

20  one time, to prevent larger groups from causing fights or disruptive behavior.  Certain non civil

21  inmates must be segregated from one another, such as opposing gang members, to prevent

22  violence.  Thus, it is difficult to provide great amounts of outdoor recreation for all inmates.  This

23  is a legitimate penalogical interest set forth by defendant.  Therefore, summary judgment is

24  granted.  To the extent plaintiff has demonstrated any constitutional violation with respect to

25  outdoor recreation, as will be discussed below, plaintiff has failed to link defendant to any

26  violation.

Eleventh Amendment Immunity

Under 42 U.S.C. § 1983, an individual may sue "[e]very person who, under color of [law] subjects" him "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  In order to be subject to suit under § 1983, however, the alleged offender must be a "person" acting under color of state law.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 60, 109 S.Ct. 2304 (1989).  States do not qualify as "person[s]" for § 1983 purposes because the Eleventh Amendment affords them sovereign immunity.  Id. at 71.  By contrast, local governments, including counties, qualify as "person[s]" within the meaning of § 1983.  See Monell v. Department of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018 (1978).

The Supreme Court established the framework for determining whether an official acts for the state or county for § 1983 purposes in McMillian v. Monroe County, 520 U.S. 781, 117 S.Ct. 1734 (1997), which involved a sheriff in Alabama.  As an initial matter, a court must "ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue."  Id. at 785 (citing Jett v. Dallas Independent School Dist., 491, U.S. 701, 737, 109 S.Ct. 2702 (1989)).  More importantly, if the court answers the first question in the affirmative, it must then examine "the actual function of [the] governmental official, in a particular area" based on "the definition of the official's functions under relevant state law."  Id. at 786.  Although this inquiry requires an examination of the "state's constitution, statutes and case law," Brewster v. Shasta County, 275 F.3d 803, 806 (9th Cir. 2001), it is ultimately a question of federal law.  See Streit v. County of Los Angeles, 236 F.3d 552, 560 (9th Cir. 2001).

As the court finds that the defendant in this case, the Sheriff, exercises final policymaking authority regarding the holding of SVP inmates at SCMJ, the determinative question before the court is whether the defendant acts for the county or the state in adopting and implementing such policies.  As set forth below, binding circuit precedent compels the conclusion that the defendant acts for the county in setting policy regarding house SVP inmates

1   that are held at SCMJ.  Accordingly, the Eleventh Amendment does not immunize the defendant

2   from liability in this action.

3           The Ninth Circuit has twice applied the principles articulated in McMillian to the

4   management of county jails by California sheriffs, and in each of these cases it held that the

5   sheriffs are county (not state) actors under § 1983.  See Streit v. County of Los Angeles, 236 F.3d

6   552, 561 (9th Cir. 2001) (the sheriff acts on behalf of the county in "the oversight and

7   management of the local jail"); Cortez v. County of Los Angeles, 294 F.3d 1186, 1191 (9th Cir.

8   2002) ("We ... hold that the County is subject to § 1983 liability for the Sheriff's actions taken

9   here pursuant to his role as administrator of the county jail.").  In Streit and Cortez, the Ninth

10   Circuit found two discrepancies between the legal status of California sheriffs and the Alabama

11   sheriffs in McMillian particularly salient in reaching its holdings.  First, the Ninth Circuit

12   observed in Cortez that California counties exercise ultimate control over the management of

13   local jails by sheriffs, as opposed to the circumstances confronted by the Supreme Court in

14   McMillian, where the State of Alabama exercised final authority over the law-enforcement duties

15   of its sheriffs.  See Cortez, 294 F.3d at 1190.  Second, in Streit the Ninth Circuit emphasized that

16   in contrast to Alabama law, which provides that the state is liable for § 1983 judgments against

17   sheriffs, California law requires counties to indemnify sheriffs for their constitutional torts.  236

18   F.3d at 562.  Since under current California law counties still have final control over the

19   management of county jails, see Cal. Gov.Code § 23013 (authorizing counties to transfer control

20   of the local jail from the sheriff to a department of corrections), and remain liable for § 1983

21   judgments against the county sheriff, see Cal. Gov.Code § 815.2, the Ninth Circuit's application

22   of McMillian in Streit and Cortez requires this court to conclude that the defendant acted on

23   behalf of the County in this case, and may therefore be sued under § 1983.

24           Defendant relies on the California Supreme Court's decision in Venegas v.

25   County of Los Angeles, 32 Cal.4th 820, 831 (2004), and the California Court of Appeal's

26   decision in County of Los Angeles v. Superior Court, 68 Cal. App. 4th 1166, 1174 (1998) in

1  urging this court to reach a contrary result.

2          In Venegas, the court held that a county sheriff sued under § 1983 for

3  unreasonable search and seizure is a state actor entitled to Eleventh Amendment sovereign

4  immunity.  32 Cal.4th at 828; see also, Bougere v. County of Los Angeles, 141 Cal.App.4th 237,

5  246–48 (2006) (holding that a sheriff acts for the state when placing inmates within the jail to

6  ensure safety).  In County of Los Angeles, the court held that county sheriffs were state actors

7  when establishing policies for the release of persons from the county jail.  68 Cal.App. 4th

8  at1174.  Defendant does not address the Ninth Circuit cases cited above, but states that there

9  have been no published federal cases since Venegas, which seems to imply that the court should

10  not apply existing Ninth Circuit precedent.  The court will look to Ninth Circuit precedent as

11  opposed to state law.

12          Federal case law governs the issue of whether the sheriff is a state or county actor

13  under § 1983.  As the Ninth Circuit has explained, federal courts may look to state case law to

14  the extent that it is persuasive, but need not "blindly accept its balancing of the different

15  provisions of state law in determining liability under § 1983."  Weiner v. San Diego County, 210

16  F.3d 1025, 1029 (9th Cir. 2000).  When confronted with a conflict between state decisions and

17  its own precedents, the Ninth Circuit has made it clear that its own cases are controlling because

18  "section 1983 ... questions implicate federal, not state, law."  Streit, 236 F.3d at 564.  Indeed, in

19  both Streit and Cortez, the Ninth Circuit squarely rejected arguments that it should defer to the

20  California Court of Appeal's decision in County of Los Angeles v. Superior Court, in deciding

21  whether sheriffs are state or county actors.  Id. at 564; Cortez, 294 F.3d at 1191 (citing Brewster

22  v. Shasta County, 275 F.3d 803, 811 (9th Cir. 2001) ("We are not bound by the determination of

23  the California Court of Appeal that sheriffs are state actors.")).  Furthermore, analogous post-

24  Venegas district court decisions have refused to adopt arguments that closely resemble the

25  contention proffered by defendant on this motion, instead deferring to the applicable Ninth

26  Circuit precedents.  See, e.g., Smith v. County of Los Angeles, 535 F.Supp.2d 1033, 1037, fn. 1

1   (C.D.Cal.2008) ("administering medical care to inmate-patients already in custody 'involve[s]

2   jail oversight and management, not law enforcement.' " (quoting <u>Clemmons v. City of Long</u>

3   <u>Beach</u>, 2006 WL 4599674, at *5 (C.D.Cal. 2006))); <u>Miller v. Butte County</u>, 2008 WL 4287665,

4   at *3-4 (E.D.Cal .2008) (sheriff is a county actor in § 1983 suit for withholding medical care

5   from an inmate).

6          Moreover, even if <u>Venegas</u> were binding authority, it is inapplicable to the present

7   case. <u>Venegas</u> held that the sheriff acts on behalf of the state "while performing state law

8   enforcement duties such as investigating possible criminal activity." 32 Cal.4th at 839.  Because

9   <u>Venegas</u> involved an unreasonable search and seizure claim, which arose during the sheriff's

10  performance of a core law-enforcement function, it is wholly dissimilar to the instant case and

11  the housing conditions in the jail.  Therefore, the defendant is not entitled to Eleventh

12  Amendment immunity.

13                 <u>Quasi-Judicial Immunity</u>

14         Defendant also argues that he is entitled to absolute quasi-judicial immunity

15  because he took custody of plaintiff pursuant to a court order.  Absolute judicial immunity

16  extends not only to judges, but to nonjudicial officers for "all claims relating to the exercise of

17  judicial functions."  <u>Burns v. Reed</u>, 500 U.S. 478, 499, 111 S.Ct. 1934 (1991) (Scalia, J.,

18  concurring in part and dissenting in part).  State officials performing the duties of advocate or

19  judge may enjoy quasi-judicial immunity for certain functions but not for all functions of their

20  job.  <u>Swift v. California</u>, 384 F.3d 1184, 1188 (9th Cir. 2004) (quotations and citation omitted).

21  "For example, a state prosecutor is entitled to absolute immunity when engaged 'in activities

22  intimately associated with the judicial phase of the criminal process,' but is only entitled to

23  qualified immunity when 'performing investigatory or administrative functions, or [when]

24  essentially functioning as a police officer or detective.'" <u>Swift</u>, 384 F.3d at 1188 (quotations and

25  citations omitted).

26  \\\\\

1    In this instant case, defendant has failed to show how, by obeying the court order

2    to receive and house plaintiff, he was acting in a quasi-judicial role as opposed to an

3    administrative function.  By simply housing plaintiff, defendant has not met his burden to show

4    that he was intimately involved with plaintiff's criminal process or that he was otherwise acting

5    in a quasi-prosecutorial or quasi-judicial role.  Plaintiff's claims do not arise from the fact of his

6    confinement, rather regarding the conditions under which he was held.  Defendant has failed to

7    demonstrate a basis for quasi-judicial immunity.

8                          Individual and Municipal Liability

9    Plaintiff brings this action against defendant in his individual and official

10   capacities.  In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) the

11   violation of a federal constitutional or statutory right; and (2) that the violation was committed by

12   a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250

13   (1988); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  An individual defendant is not

14   liable on a civil rights claim unless the facts establish the defendant's personal involvement in the

15   alleged rights deprivation, as there is no respondeat superior liability under section 1983.  Jones,

16   297 F.3d at 934.  That is, plaintiff may not sue any official on the theory that the official is liable

17   for the unconstitutional conduct of his or her subordinates.  Ashcroft v. Iqbal, 556 U.S. 662, 676,

18   129 S.Ct. 1937 (2009).

19   Because respondeat superior liability is inapplicable to § 1983 suits, "a plaintiff

20   must plead that each Government-official defendant, through the official's own individual

21   actions, has violated the Constitution."  Id.  To be held liable, "the supervisor need not be directly

22   and personally involved in the same way as are the individual officers who are on the scene

23   inflicting constitutional injury."  Starr v. Baca, 652 F.3d 1202, 1205 (9th Cir. 2011) (quotations

24   omitted).  Supervisors can be held liable for the actions of their subordinates (1) for setting in

25   motion a series of acts by others, or knowingly refusing to terminate a series of acts by others,

26   which they knew or reasonably should have known would cause others to inflict constitutional

injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in a constitutional deprivation by subordinates; or (4) for conduct that shows a "reckless or callous indifference to the rights of others." Al-Kidd v. Ashcroft, 580 F.3d 949, 965 (9th Cir. 2009) (citing Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotation marks omitted)).  Even so, "purpose rather than knowledge" is required to impose liability on a supervisor for discharging responsibilities in a way that may have resulted in constitutional deprivations.  See Iqbal, 556 U.S. at 678 (rejecting claim that supervisor's mere knowledge of subordinate's discriminatory purpose amounts to constitutional violation by supervisor).

It is undisputed that Sheriff McGinnis is the only named defendant and was not personally involved in any of the conduct related to sleeping on the floor for two days or lack of outdoor recreations during certain times.  While plaintiff identified certain other actors in the course of the complaint, plaintiff made a decision not to name those individuals as defendants. Plaintiff generally asserts that McGinnis as supervisor set into motion these acts and is therefore responsible.  However, as noted above, defendant cannot be held liable simply on a theory of respondeat superior.  Nor is there evidence to show that defendant set into motion these acts or acquiesced to the conduct.  While plaintiff did file numerous grievances, most of these grievances did not describe having to sleep in the classroom or the lack of outdoor recreation. Most grievances simply stated that his conditions of confinement were punitive.  While plaintiff did file a grievance that discussed the lack of outdoor recreation, the grievance also listed dozens of other issues, many that were frivolous, and plaintiff filed the grievance near the end of his approximate six month time at SCMJ, so there is no indication that defendant was aware nor has plaintiff himself presented any arguments regarding defendant's knowledge.  Doc. 1, Compl., Exh. 4.  Thus, plaintiff has failed to link McGinnis, in his individual capacity, to either of these claims, so summary judgment is granted.

\\\\\\

1     A damages claim against an official capacity defendant is equivalent to a claim

2 against the governmental entity represented by the official capacity defendant.  See Hafer v.

3 Melo, 502 U.S. 21, 25, 112 S.Ct. 358 (1995).  Therefore, plaintiff's damages claim against the

4 sheriff in his official capacity is equivalent to a claim against the county itself.  See Brewster v.

5 Shasta County, 275 F.3d 803, 806-07 (9th Cir. 2001) (County Sheriff represents county, not state,

6 in administering county jail).

7     Municipalities and other local government units such as counties are considered

8 "persons" under 42 U.S.C. § 1983 and therefore may be liable for causing a constitutional

9 deprivation.  Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690-91, 98 S.Ct.

10 2018 (1978).  However, liability under § 1983 only exists if plaintiff shows that his constitutional

11 injury was caused by employees acting pursuant to the municipality's policy or custom.  See

12 Villegas v. Gilroy Garlic Festival Ass'n, 541 F.3d 950, 964 (9th Cir. 2008) (citing Monell 436

13 U.S. at 690–94).  In order for plaintiff to proceed on claims against defendant in his official

14 capacity, plaintiff must show that his specific policies and practices were the moving forces

15 behind the alleged violations of plaintiff's constitutional rights.  See Gibson v. County of

16 Washoe, 290 F.3d 1175, 1185–86, 1193–94 (9th Cir. 2002).

17     "[T]here are three ways to show a policy or custom of a municipality: (1) by

18 showing a longstanding practice or custom which constitutes the standard operating procedure of

19 the local government entity; (2) by showing that the decision-making official was, as a matter of

20 state law, a final policymaking authority whose edicts or acts may fairly be said to represent

21 official policy in the area of decision; or (3) by showing that an official with final policymaking

22 authority either delegated that authority to, or ratified the decision of, a subordinate."  Villegas,

23 541 F.3d at 964 (internal quotations omitted).

24     Plaintiff is unable to overcome summary judgment regarding a Monell violation

25 for spending two days in the classroom without a mattress or less outdoor recreation than other

26 inmates.  It is undisputed that the two days in the classroom was an isolated incident during

1   plaintiff's six month stay at SCMJ following the altercation with his cellmate.  There are no

2   allegations of other inmates sleeping on the floor nor did it occur during plaintiff's prior four

3   month stay at SCMJ that is the basis of the related action, No. 2:10-cv-1727 GGH P.[15]  As it is

4   clear this is not a practice, custom or policy of SCMJ or even that a high ranking official was

5   aware, summary judgment is granted as to this claim.

6          Similarly, there is no <u>Monell</u> violation regarding plaintiff's outdoor recreation

7   time.  In the instant case, there were certain instances in plaintiff's six month stay at SCMJ,

8   where he was denied outdoor recreation or received less than other inmates and on average he

9   received less.  Assuming these instances present a constitutional violation, which the court has

10  not found, there is no <u>Monell</u> violation.  There is no evidence of any practice, custom or policy

11  that civil detainees should receive less outdoor recreation than criminal defendants.  In the related

12  case, where plaintiff spent four months in SCMJ in 2009, he received more outdoor recreation

13  time than other inmates.  See No. 2:10-cv-1727 GGH P Order Granting Summary Judgment, Doc

14  96 at 19.  Plaintiff argues that because he received less outdoor recreation than other inmates, it

15  must be a <u>Monell</u> violation.  This is insufficient and plaintiff has failed to present any evidence to

16  refute defendant's argument and overcome summary judgment.

17                 <u>Punitive Damages</u>

18         Plaintiff also seeks punitive damages.  However, the Supreme Court has held that

19  punitive damages are not available against a municipal corporation for a violation of 42 U.S.C. §

20  1983 because municipalities enjoy traditional common law immunity from punitive damages,

21  and such damages would work a hardship on innocent taxpayers.  <u>Newport v. Facts Concerts</u>,

22  453 U.S. 247, 271, 101 S.Ct. 2748 (1981); <u>Mitchell v. Dupnik</u>, 75 F.3d 517, 527 (9th Cir. 1996).

23  No punitive damages are allowed against a municipality unless expressly authorized by statute.

24  <u>Cook County, Ill. v. United States, ex rel. Chandler</u>, 538 U.S. 119, 129, 123 S.Ct. 1239 (2003).

25

26         [15] A court may take judicial notice of court records.  <u>See</u> <u>MGIC Indem. Co. v. Weisman</u>,
803 F.2d 500, 505 (9th Cir. 1986); <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th Cir. 1980).

1   Thus, punitive damages are not available in the instant case, even if a constitutional violation

2   were found to have occurred.

3   <u>Miscellaneous Claims</u>

4   Summary judgment is also be granted for plaintiff's Equal Protection claim.

5   Plaintiff concedes that all SVP inmates at SCMJ were treated the same, rather he argues that SVP

6   inmates at other facilities are treated better, therefore plaintiff opposes summary judgment and

7   requests discovery be reopened to further support this claim.

8   Since this action does not involve a suspect classification, plaintiff may establish

9   an Equal Protection claim by showing that similarly situated individuals were intentionally

10  treated differently without a rational relationship to a legitimate state purpose.  <u>Engquist v.</u>

11  <u>Oregon Department of Agriculture</u>, 553 U.S. 591, 601–02, 128 S.Ct. 2146 (2008).  To survive

12  summary judgment plaintiff must articulate who he is similarly situated to and how they are

13  similar in order for disparate treatment to equate to a violation of his rights to equal protection.

14  <u>See</u> <u>McCollum v. California Dept. Of Corrections and Rehabilitation</u>, 647 F.3d 870, 880–81 (9th

15  Cir. 2011).  Even assuming if SVP inmates at other jails did have single cells or extra recreation,

16  this fails to raise a viable Equal Protection claim as these parties are not similarly situated to

17  plaintiff and defendant cannot be liable for how others were treated in different facilities where

18  defendant has no authority.  Discovery will not be reopened and summary judgment is granted

19  for this claim.  As there are no constitutional violations the court will not address the qualified

20  immunity arguments.

21  <u>Conclusion</u>

22  If plaintiff were to have his way, no jail facility could house him, because it would

23  cease to be a jail, and more like a half-way house.  In order to accommodate plaintiff's request, a

24  special facility within the jail would have to be constructed.  As Justice Kennedy set forth:

25       The difficulties of operating a detention center must not be
     underestimated by the courts.  Jails (in the stricter sense of the

26       term, excluding prison facilities) admit more than 13 million

1    inmates a year. See, e.g., Dept. of Justice, Bureau of Justice
     Statistics, T. Minton, Jail Inmates at Midyear 2010—Statistical
2    Tables 2 (2011). The largest facilities process hundreds of people
     every day; smaller jails may be crowded on weekend nights, after a
3    large police operation, or because of detainees arriving from other
     jurisdictions. Maintaining safety and order at these institutions
4    requires the expertise of correctional officials, who must have
     substantial discretion to devise reasonable solutions to the
5    problems they face.

6    Florence v. Board of Chose Freeholders, 132 S.CT. at 1515.

7    To complicate matters, the detainees comprise the spectrum of "ordinary joes" who are no

8    different from any of us but for the making of a "little" mistake, to those with whom you would

9    not turn your back for a second; from those who have been convicted of misdemeanors to

10   persons awaiting trial in a capital case; from those who have become "sober as a judge" to those

11   who have little sanity remaining.  However, it is not possible to construct a myriad of markedly

12   different conditions of confinement to account for everyone's special make-up.  While the law is

13   clear that pretrial detainees or civil committees cannot be punished awaiting trial or commitment

14   proceedings, jail is not nice and no matter what jail authorities do, a rose by any other name still

15   [feels] the same.  This case present nothing but the ordinary vicissitudes of jail.

16          Accordingly, IT IS HEREBY ORDERED that defendant's motion for summary

17   (Doc. 30) be granted and this case closed.

18   DATED: August 10, 2012

19

20                    /s/ Gregory G. Hollows
              UNITED STATES MAGISTRATE JUDGE

21   GGH: AB
     rain0030.sj
22

23

24

25

26